**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) ) Plaintiff, ) ) v. ) ) TYLER SIMS, ) ) Defendant. ) ) | **CRIMINAL ACTION** No. 13-10168-4-MLB |

**MEMORANDUM AND ORDER**

This case comes before the court on defendant Tyler Sims' motion to suppress. (Doc. 49). The motion has been fully briefed and is ripe for decision. (Doc. 56). The court held an evidentiary hearing on April 14, 2014. Sims' motion is granted in part and denied in part for the reasons herein.

**I. Facts**

Wichita Police Detective Eddie Padron was involved in an undercover operation in October 2013. Padron learned that Angel Lopez, a co-defendant, was selling methamphetamine and Padron set up a buy with Lopez. After the first buy in early October, officers followed Lopez to 4200 East Harry. At that location, officers observed Lopez meet with an unknown individual. Officers believed that Lopez purchased the methamphetamine from the unknown individual prior to selling the drugs to Padron. The unknown individual was later identified as co-defendant Raul Marquez-Ramirez (Marquez). Officers determined that Marquez lived at 4202 East Wilma. Officers began surveillance on the Wilma house.

Padron conducted three additional buys from Lopez. Prior to

each buy, Lopez was observed meeting with Marquez. During the undercover operation, the officers did not observe Lopez or Marquez meet with Sims nor did they observe a GMC Yukon at the Wilma house.

The fourth and final buy occurred on October 15, 2013 at 4:54 p.m. After the buy, officers arrested both Lopez and Marquez. Several officers than proceeded to the Wilma house in order to do a "knock and talk." Padron believed that the Wilma house contained methamphetamine. The Wilma house is a duplex and located on a gravel drive directly north of Wilma Street, which runs east to west. The gravel drive is circular and there are other duplexes on that circular drive or cul-de-sac.

Padron, Cowley County deputy Allen, and detective Gary Knowles approached the front door of the Wilma house. Padron was in street clothes and Knowles was wearing a shirt with the word "police" on the back.[1] Detectives Weber, Maben, Miller and Lieutenant Bannister were also at the house and in street clothes. Maben positioned himself in the front of the house and Weber and Miller were in their vehicles on Wilma Street.[2]

Padron knocked on the door and it was answered by co-defendant Emma Velo.[3] Velo stated that she did not live at the house. While talking to Velo, Padron observed a gun holster in the house. Padron was concerned for the safety of the officers and asked Velo to leave

---

[1] There was no evidence concerning Allen's clothing.

[2] There was no evidence concerning the position of Bannister during the "knock and talk."

[3] At the time of the "knock and talk," Velo was not part of the investigation.

-2-

the house. Padron and Knowles did a protective sweep inside the house. Allen remained outside with Velo during the sweep.

At some point, either prior to the sweep or during the sweep, a GMC Yukon Denali drove into the gravel drive and up to the front of the house. An unknown male was the driver and there were no other occupants. The driver, Sims, had a surprised look on his face when he saw all of the officers at the house. Sims then backed up the Yukon and positioned it south, directly back towards Wilma Street.[4] Maben approached the Yukon and it stopped. Maben asked Sims if he could ask him some questions. Sims asked Maben if he was a police officer. Sims appeared to be nervous and was looking around his Yukon and outside. Weber and Miller approached the Yukon from Wilma Street.[5]

Maben asked Sims to get out of the Yukon. Sims got out.[6] Maben testified that he wanted Sims out of the Yukon because Maben was concerned for the safety of Weber and Miller who were on the gravel

---

[4] The government's response states that Sims parked the Yukon at the house and "Sims opened the driver's door and began to get out of the Yukon until he saw one of the officers wearing a vest marked 'police.' After Sims saw the officer he looked surprised and he put his vehicle in reverse." (Doc. 56 at 2). The evidence at the hearing, however, was that Sims did not get out of the Yukon until Maben told him to.

[5] Weber testified that they may have been running towards the Yukon because they were concerned for the safety of the officers performing the "knock and talk."

[6] The government's response states that as Sims complied with the request, "he exited the car, he locked the doors, threw the keys to the vehicle inside and then shut the door." (Doc. 56 at 2). There was no evidence at the hearing that this occurred when Sims got out of the Yukon.

-3-

drive in front of the Yukon. Maben then patted Sims down[7] because he thought Sims was acting suspicious and believed him to be engaged in criminal activity.[8] Maben then asked Sims if he could check his pockets. Sims consented. Maben discovered a wad of cash in one of Sims' pockets.[9] Sims stated that he had just come from the bank.

Weber asked Sims his name and then identified himself.[10] Weber recognized Sims from a civil investigation which occurred in January 2013. The investigation concerned a threat and Sims was the alleged victim. Weber then questioned Sims about his reasons for being in the area. Sims stated that he had pulled in the drive to turn around because he had made a wrong turn. Sims denied knowing any individuals at the house. Weber than approached Velo and asked her if she knew Sims. Velo stated that she had seen Sims on four occasions but did not identify the location or times of the encounters. Weber returned to Sims and asked for permission to search the Yukon. Sims did not give his consent. Padron called detective Bryan Martin to come to the house and perform a drug dog snif around the Yukon. Padron told

---

[7] Maben testified that he could not recall if he asked permission to pat down Sims. Weber testified that he did not hear Maben ask Sims if he could pat him down.

[8] At no point did any officer testify that he believed Sims to be armed.

[9] Maben's report notes that Sims stated that he had $16,000 in his pocket. Maben, however, did not verify the amount of money and testified that he gave it to another officer to be placed into evidence. No other officer testified about the money that was seized from Sims' pocket.

[10] Maben testified that someone ran a warrant check and ran Sims' driver's license. Weber also testified that someone was asked to run a warrant and driver's license check. There was no evidence with respect to who, if anyone, asked for Sims' driver's license during the questioning; nor was there evidence of the results of the check.

-4-

Martin that Sims was being detained after a traffic stop.[11]

Martin arrived with his drug dog, Kilo, and Martin instructed Kilo to run around the Yukon.[12] Kilo detected drug odor and alerted. Martin left the scene and the remaining officers proceeded to search the Yukon.[13] Presumably, Sims was taken into custody. Padron obtained a search warrant for the house and it was executed after 9 p.m. that evening.

On October 23, 2013, Sims was indicted on a single count of conspiracy to distribute methamphetamine. (Doc. 15). Sims moves to suppress all evidence found on his person, in the Yukon, his identity and the drugs ledgers found in the home which identify him on the basis that the officers did not have reasonable suspicion to detain him.

**II. Analysis**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Tenth Circuit has defined "three types of police-citizen encounters: '(1) consensual encounters which do not implicate the Fourth

---

[11] All officers, including Padron, testified that Sims did not commit a traffic violation. The officers also testified that the term "traffic stop" means stopping a vehicle that is suspected of violating traffic laws. There is no evidence, however, that Sims committed a traffic violation when he turned into the gravel drive and reversed the Yukon.

[12] The timing of the sequence of events is not clear. Weber testified that Martin arrived ten minutes after Sims got out of the Yukon and Maben testified the lapse in time was 30 minutes.

[13] At some point, a window in the Yukon was broken to gain entry. There was no testimony concerning the items seized from the Yukon.

Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.'" United States v. Brown, 496 F.3d 1070, 1074 (10th Cir. 2007) (quoting United States v. Davis, 94 F.3d 1465, 1467-68 (10th Cir. 1996)). What starts out as a consensual encounter may evolve into an investigative detention, and, of course, a detention may evolve into an arrest. See United States v. White, 584 F.3d 935, 944-45 (10th Cir. 2009). The court must analyze the encounter between Sims and the officers from its inception and determine whether the requisite level of suspicion existed at each stage. Id. at 945.

**A. Initial Encounter**

An encounter between a citizen and police that does not rise to the level of a seizure does not implicate the Fourth Amendment. United States v. Johnson, 364 F.3d 1185, 1188 (10th Cir. 2004). Even if police do not have an individualized basis for suspecting a citizen of wrongdoing, they may nonetheless approach the citizen, ask questions, ask for identification, and ask to search the person's property, so long as they "do not convey a message that compliance with their requests is required." Florida v. Bostick, 501 U.S. 429, 434-35 (1991). The critical inquiry, for purposes of determining whether a seizure occurred, is whether a reasonable person, in view of all the circumstances, would have believed that he or she was free to leave or otherwise end the encounter. United States v. Harris, 313 F.3d 1228, 1234 (10th Cir. 2002).

Courts consider numerous factors in determining whether a police-citizen encounter amounts to a seizure, including the location of the encounter; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised the defendant at any time that he has the right to terminate the encounter or refuse consent. United States v. Lopez, 443 F.3d 1280, 1284 (10th Cir. 2006). No single factor is dispositive. United States v. Rogers, 556 F.3d 1130, 1137-38 (10th Cir. 2009).

Sims argues that he was detained by the officers at the point they approached the Yukon and prevented his departure. The government contends that the encounter with Sims was consensual and he was not detained until after Sims refused to give consent to the search of the Yukon. The evidence presented at the hearing established that Sims turned into the gravel drive, pulled up to the house, saw an officer, then reversed and placed the Yukon in a position to leave the gravel street. At that point, Maben approached the Yukon and asked Sims if he could ask him some questions. Maben, however, did not testify as to whether Sims said yes or no. Sims' response was to ask Maben if he was a police officer. Additionally, at the time Maben approached the driver's side door, Weber testified that he and Miller were either walking fast or running towards the front of the Yukon. All officers testified that the Yukon's path was not blocked. Maben, however, was concerned that Weber and Miller would be injured when Sims drove off.

-7-

At the time Sims was stopped, there were at least seven officers at the house. The officers did not draw their weapons and everyone but Knowles was wearing street clothes. The officers did not threaten Sims at any time. After the short conversation, Maben "asked Sims to get out of the car." Maben did not testify as to exactly how he asked him to get out of the Yukon. The phrase "get out" indicates a command. At the time Sims was asked or told to get out, two officers were positioned in the exit path, although they testified that there were not blocking the path. This is confusing. Maben testified that he was concerned for the two officers' safety because of where they were standing and that was one reason why he wanted Sims to get out of the Yukon. If the officers were not blocking the exit, Maben's concerns were unfounded. Therefore, the question of whether Sims' exit of the Yukon was consensual or elevated the encounter to a detention is a close call. The court does not need to decide that, however, because the court finds that the addition of the subsequent frisk to the circumstances elevates the encounter to a detention.[14]

The government contends that the frisk was voluntary and that Sims consented. The testimony, however, is not clear. Maben testified that he could not recall whether he asked Sims' permission to frisk him and Weber, who was present, testified that he did not hear Maben ask Sims' permission. The government has the burden of proving a voluntary consent and it has not done so. Florida v. Royer, 460 U.S. 491, 103 S. Ct. 1319, 75 L. Ed.2d 229 (1983); United States v. Price, 925 F.2d 1268, 1271 (10th Cir. 1991). Therefore, the court

---

[14] Weber testified that at the time Sims was frisked, he was detained and could not leave.

is faced with two questions, whether the officers had reasons to detain Sims and whether they had a reasonable suspicion to believe that Sims was armed and dangerous.

### B. Investigative Detention

Law enforcement officers may stop and briefly detain a person for investigative reasons if the officer has a reasonable suspicion that criminal activity may be afoot. United States v. Sokolow, 490 U.S. 1, 7 (1989). Reasonable suspicion requires a "particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417–18 (1981). The government bears the burden of proving the reasonableness of the officer's suspicion. United States v. Salzano, 158 F.3d 1107, 1111 (10th Cir. 1998).

Under Terry, the court applies a two-prong test for determining the reasonableness of investigative detentions. First, the detention must be "justified at its inception." Terry v. Ohio, 392 U.S. at 20. An officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." Id. at 21. Those facts must tend to show that the detainee has committed or is about to commit a crime. See Johnson, 364 F.3d at 1189. Second, the officer's actions must be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20.

In determining whether reasonable suspicion exists, the court again looks to the "totality of the circumstances" to determine if the officers had a "particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002).

Reasonable suspicion may exist even if each factor alone is "susceptible of innocent explanation." Id. at 277 (stating that "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct").

In making the determination, each factor is not to be considered in isolation because even though one factor alone may be innocently explained, the factors considered together can support reasonable suspicion. United States v. Lopez, 518 F.3d 790, 797 (10th Cir. 2008). The court must "be careful to judge the officer's conduct in light of common sense and ordinary human experience but also to grant deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances." Id.

After considering all of the circumstances, the court finds that the officers did not have reasonable suspicion to believe that Sims was a drug trafficker or that the Yukon contained narcotics. The officers based their suspicions on the following facts: nervousness, pulling up to a drug house, and reversing after seeing an officer. First, "nervousness is of limited significance in determining reasonable suspicion." United States v. Salzano, 158 F.3d 1107, 1113 (10th Cir. 1998)("the government's repetitive reliance on . . . nervousness . . . 'must be treated with caution.'")

Next, the fact that Sims pulled up to a house belonging to a drug dealer, standing alone, is not a basis for concluding that Sims himself was engaged in criminal conduct. See Brown v. Texas, 443 U.S. 47, 52 (1979). In United States v. Davis, 94 F.3d 1465, 1468-1469 (10th Cir. 1996), the Tenth Circuit held that the officers did not a reasonable and articulable suspicion that the defendant was engaging

-10-

in criminal activity when the defendant was parked outside a known criminal establishment, got out of the car when he saw the officers, refused to stop, kept his hands in his pockets, and had a criminal history.

In this case, the testimony clearly shows that Sims did not attempt to get out of the Yukon after he pulled up to the house but immediately placed the Yukon in reverse. At the time, the officers were not executing a search warrant but were only doing a "knock and talk." The officers had no reason to believe Sims or the Yukon had been involved in illegal activity at any time prior to October 15, 2013. Moreover, as shown in the exhibits, the gravel drive was a circle which contained more than one duplex. Sims could have had a legitimate reason for pulling up to the duplex as it was a multifamily residence. See Davis, 94 F.3d at 1469. Therefore, the government has not met its burden to show that officers had a reasonable and articulable suspicion that Sims was engaged in drug trafficking.[15] See id.

**C. Terry Frisk**

Moreover, the court finds that the officers did not have reason to conduct a Terry frisk when Sims was told to get out of the Yukon. Fourth Amendment jurisprudence has long recognized the reasonableness of allowing law enforcement officers to pat down or frisk lawfully detained individuals who might pose a threat to their safety or the safety of others nearby. See Terry v. Ohio, 392 U.S. 1, 23–24, 88 S.

---

[15] The court notes that the government's response provides no authority to support its position that the facts in this case give rise to a finding that the officers had a reasonable suspicion to believe Sims was engaged in drug trafficking.

-11-

Ct. 1868, 20 L. Ed.2d 889 (1968). An officer may conduct a pat-down search or frisk if he "harbors an articulable and reasonable suspicion that the person is armed and dangerous." United States v. Hishaw, 235 F.3d 565, 570 (10th Cir. 2000); United States v. House, No. 11-4102, 2012 WL 987575, *4 (10th Cir. Mar. 23, 2012) ("the officer must have a reasonable belief that the suspect is both (1) armed, and (2) dangerous.")(emphasis supplied).

None of the officers testified that they believed Sims to be armed or dangerous. The officers had no facts to conclude that Sims was armed nor had they observed Sims or the Yukon during the two week undercover operation. Maben testified that he conducted a pat down because he was suspicious that Sims was a drug dealer and Sims was acting nervous. In United States v. Harris, 313 F.3d 1228 (10th Cir. 2002), the Circuit considered nervous and evasive behavior as a ground for reasonable suspicion that a person is armed and dangerous. The Circuit held that the defendant's nervousness alone was not enough to justify the frisk, but found the frisk justified in Harris because the defendant would not remove his hands from his pockets after being asked to do so.

In this case, there was no reason to believe that Sims was armed. Sims did not make any sudden movements in the Yukon or after he was outside. Moreover, there was no evidence that the drug dealers who operated out of the Wilma house carried firearms. Therefore, the Terry frisk was an illegal search and the money seized from Sims' pocket must be suppressed.

**D. Items to be Suppressed**

Because the officers detained Sims without reasonable suspicion

-12-

and conducted an illegal frisk, the items seized as a result of the detention must be suppressed. See <u>United States v. Miller</u>, 84 F.3d 1244, 1250 (10th Cir. 1996). Sims seeks an order suppressing all items seized from his person and Yukon. These items are suppressed as they were seized as a result of Sims' illegal detention and frisk. Sims' motion also seeks to suppress his identity and drug ledgers from the house. Sims has no standing to challenge the search of house. Moreover, the testimony at the hearing established that Weber knew Sims' identity after approaching the Yukon. Therefore, the motion to suppress Sims' identity and any items seized from the house is denied.

### III. Conclusion

Sims' motion to suppress is granted in part and denied in part. (Doc. 49). This case will be tried to a jury on May 13, 2014 at 9:00 a.m.

IT IS SO ORDERED.

Dated this ___18th___ day of April 2014, at Wichita, Kansas.

s/ Monti Belot<br>
Monti L. Belot<br>
UNITED STATES DISTRICT JUDGE